3-17-0827 People of the State of Illinois Appellee by Richard Leonard v. Kenton Pellegrini Appellant by Douglas Johnson Mr. Johnson Thank you. May it please the court, counsel? My name is Doug Johnson and I represent the appellant, Kent Pellegrini, who is currently serving an 8-year sentence for the aggravated criminal sexual assault conviction of his wife. It is our position that the decision the court made after the evidentiary hearing and the post-conviction proceedings was manifestly erroneous. Specifically, we allege that Mr. Pellegrini received, the defendant received ineffective assistance of counsel because his counsel should have retained an expert in this he-said-she-said case to show the correct level of alcohol intoxication that Ms. Pellegrini had and to show how that affected her mind and her ability to recall. Briefly on the facts, what happened here is this was a couple who was heading for divorce. No, look, it's your argument, but I'll just let you know we're aware of the facts. Okay. If you argue however you want, I just want to let you know. Yep, and I will go past them then. Defendant was found guilty, of course. It was a he-said-she-said case. The trial court said there are problems on both sides. Basically, I believe him. I'm sorry, I believe her. I don't believe him. So I submit to you it was a close case, and it is undisputed she was very drunk and he wasn't. And this is a case about recall. At trial, two experts, defense had an expert that said this kind of thing can happen through consensual sex. This is not necessarily, even though this is a bad injury, no dispute. But even though it's a bad injury, this can happen through consensual sex, and the state's expert said no, this is consistent with sexual assault. So it really came down to the testimony of Ms. Pellegrini and Mr. Pellegrini. They both testified. The gist of your appeal here is that they should have called a witness. He should have called an expert witness to say that she was bombed out of her skull drunk. Well, and that's a lay person. We all, I think, either have experience with alcohol or have seen people that are really drunk. And we talk about being bombed and that type of thing. But the fact is there is a science behind this. It is a small niche, but it is a niche that Dr. Fromme, the expert that testified at the evidentiary hearing, knows a lot about through her lifelong study of this. And it is not something a lay person and the judge, I think, felt, hey, I know what drunk, he said it. He said, I know drunk witnesses, blah, blah, blah. The fact is two things. The fact finder at trial heard this woman's blood alcohol level was 0.11 from the state. That's just a little over legally drunk in the one we all know about driving drunk. When, in fact, it could have been as high as 0.23, according to the expert. My expert wasn't even crossed at the evidentiary hearing. He said it was between 0.19 and 0.23. That's a lot higher. And that means she was in a blackout. And a blackout. And some of the science behind it is. All right. So that's what you wanted him to, you said counsel was ineffective for failing to call a witness that says the victim was blacked out. Blacked out and her testimony, therefore, unreliable because she doesn't remember a thing. Blacked out, that yes or no, right? Yes, Your Honor. Now, let me answer this. Wasn't his defense at trial consent? His defense at trial. Yes. Okay. Now, how can legally in this state can somebody who's blacked out consent to sex? I would think so, yes. You would? Yeah, because she's blacked out. Again, that doesn't mean that he knows she's blacked out. What happens here in the science is that her short-term memory is not converted to long-term memory. That's what Dr. Frommie said. So she doesn't, and we know this woman doesn't remember, but that doesn't mean that she was, that he should have known she wasn't consenting. For all, yes, absolutely. That's what the blackout is. And this woman was, we have video of her passed out in the backyard. But people can go through their normal routines in a blackout, and that's what Dr. Frommie said. And that's why some of this is counterintuitive. She doesn't remember, and in a blackout, those memories don't come back. That's what Dr. Frommie said, is you are never getting it back. But what does happen is people hear suggestions, and she may very well believe, Ms. Pellegrini may believe what she's testifying to. But the fact is, Dr. Frommie came in, and she said, this was a blackout. Her testimony is unreliable. So if we are to believe now that a fact finder that heard that testimony. Well, could a reasonable fact finder find it? Assuming that the person was so intoxicated that they couldn't recall what happened, that they were also too intoxicated to legally give consent? I don't, that wasn't how the case was charged. And I think that's speculation. Well, no, I'm talking about, you know, at one time in my life, I was a real lawyer. And we're talking about trial tactics here. And if I'm a defense lawyer, and I'm relying on a consent defense, is it in my interest to say, by the way, the victim was bombed out of her skull and blacked out? Maybe that, I think bombed out of her skull, maybe not. But I think blacked out, yes. Because we have an expert to say that doesn't mean she was resisting, that doesn't mean she didn't consent, that means she doesn't remember what happened, and so you can't rely on her testimony in this he said, she said case. And, in fact, the state presented an expert at the evidentiary hearing, and he didn't say she didn't black out. His testimony, basically Dr. Frommie's testimony was unrebutted. Now, the expert, Dr. Hartman, fought it, but he didn't have the expertise that she did. And he said, he actually said at a couple points near the end of the cross-examination that Dr. Frommie knows a lot about a very narrow field. And the state expert also said Dr. Frommie knows quite a great deal about a single aspect of brain behavior function. And that's what she was testifying to. Nothing about slamming this victim, not saying, oh, you wanted it, nothing like that. She's saying, what happened in that room, you don't remember. And someone can go through their, you can't tell by looking at someone if they're blacked out. Camp Pellegrini could not, oh, yes, it's different than being, there's a difference between extremely intoxicated and being so drunk you're blacked out the next day. Blacked out again, meaning you can't recall what you did, even if someone says to you, hey, you were acting crazy last night, you can't recall it. And that's the counterintuitive thing, and that's the science that Dr. Frommie was testifying to. And Dr. Hartman, again, didn't rebut her on that. He said, Dr. Frommie doesn't have a license. Now the victim was sober enough or at least not so intoxicated that she was able, after the incident, to run to the neighbor's house and beat on the door and ask for help, right? Yes, she made those, she ran away, correct. She didn't crawl over there, she ran. Right. And that's, I understand the point, but there is a difference between extremely drunk and blacking out. Well, and the trial judge is free to take your expert's testimony or whatever. The trial court finds it worse, correct? No, I don't believe the trial court can totally ignore unrebutted expert testimony and apply his own thought of being really drunk against the blackout. If Dr. Hartman had come in and said, this woman was not in a blackout, then the judge could have said, yes, I agree. I agree with the state's expert, but that's not what he said. As I said, this is basically unrebutted testimony. All the experts said, Dr. Hartman was, she didn't have a license, which wasn't anything. She's a professor of psychology. She doesn't need one. He said, well, she's unethical because she made a diagnosis of a blackout without doing a proper clinical evaluation. And the fact is, as we showed on cross, it isn't a diagnosis. Blackout is not in the DSM-5, and it is not in, he said, well, maybe it's in the ICD, International Classification of Diseases. It's not there either. It is not a diagnosis, and that's why she was completely ethical in what she did. All he did, the expert come in, and he just kind of slammed her credentials, but then, as I said, made those statements about how highly qualified she was in this very narrow field. And so, what does the state say in its brief about Dr. Hartman? Basically nothing. Well, you can ignore Dr. Hartman. Okay, then we have unrebutted Dr. Frommie saying, here's the science. In a blackout, doesn't remember that the victim's testimony about my fight or flight kicked in. Dr. Frommie specifically said that doesn't happen. Dr. Frommie also said, and this is counterintuitive, I think, to non-experts in the blackout field, that one, the importance of an event that happens to someone does not increase the likelihood that that person will remember when they are in a blackout. So we have this testimony that we want to add to show, and again, the judge basically did not find that it was competent, or under the first prong of Strickland, it was appropriate not to call this expert. He had a rule on that. When we ask this, if you're an expert, they can say, well, these things happen generally, but what was her basis for saying this was what occurred with the victim, this particular victim, on this particular evening? What was the basis of Dr. Frommie's opinion? She suffered a blackout? Yes. Okay. Some of the things were her blood alcohol level, and she can't calculate. She said, I don't want to calculate any blood alcohol level. So she got the blood alcohol level from Dr. Lank, who said between .19 and .23, so the correct alcohol level now. And she said, okay, studies show that that is consistent with suffering a blackout. What else do we know? Well, we have a video of her passed out in the backyard. We can see that. And she testified, I don't remember how I got to the backyard, et cetera. We know the victim locked herself in the bathroom and passed out and does not recall going to the bathroom or how Mr. Pellegrini and his friend got her out of the bathroom. Okay. We also know the victim doesn't know how she got up to bed. All these things put together. Then we look at things like what was the victim, how was she talked to? Well, the police officer said to her, your wounds look knife-like, at which point for the first time the victim says, oh, yeah, that means, yeah, he was stabbing me, he was stabbing me. Suggestibility, that type of thing. So those things and more are why Dr. Srami was able to say, yes, this is a blackout. This woman was in. And that is legally an opinion, correct? And that is an expert opinion. And so then we go to the evidentiary hearing, and also if we want to talk about the competence of not calling this expert, it's very telling what the prosecutor said at trial. He made the comment, as I set forth in the brief, Judge, I was listening to the testimony of Dr. Locker, and I was expecting counsel to, this is, I'm paraphrasing, I was expecting him to ask Dr. Locker about Mrs. Pellegrini's ability to recall. I was waiting for it, and I expected it. And I submit to you that's because it was clear as day to everybody, but apparently defense counsel, that you needed to attack the fact that this woman was so drunk. Now, this prosecutor was going to say that guy is not qualified to say whether or not she could recall. But now there is an expert that is qualified. And if a reasonable fact finder, again, our burden is not to change this judge's mind. Our burden is to show a reasonable probability that a new fact finder, who got to hear this testimony, that they could not rebut with all their resources and the incredible amount of money they paid Dr. Hartman, they still couldn't get someone to say this woman was not in a blackout, and her testimony is reliable. They could not do it. So I believe easily we have met our burden to show that there is a reasonable probability that a new finder of fact would find Mr. Pellegrini not guilty. Well, what do you think the odds are, since we're going to speculate what would happen on a new trial, what do you think the odds are that if this thing went back for a new trial, and you had this expert testify to what the jury testified to at a second trial, the state won't find an expert to say, I disagree, that's nonsense, and there's no basis for saying that she was blacked out based upon just her PTOA. First of all, I don't believe I'm speculating. I think one always faces an incredible challenge when they're trying to pass the second prong of Strickland. To the extent it always, I guess, requires some level of speculation. But here, where we have an unrebutted expert, I think we're speculating about as little as possible in this type of case. Secondly, what leads me to believe that they won't have an expert that can say she wasn't in a blackout is because they didn't have one for the evidentiary hearing. They could go anywhere in the world. They paid this man, as I recall, $20,000 to $30,000 to come in and do this, and he couldn't utter those words, she was not in a blackout. He did all other things. He's maybe very qualified for in many, many areas. But the fact is, Dr. Fromme was qualified as to the issue in this case, and she reached a conclusion that was based on science. And I know we're not talking about metaphysics or things like that where we understand that's a field for an expert. This is one I think people might think, are there experts in that field, alcohol and blackouts? I think it's very myself included. Everybody knows about alcohol, but that isn't the case. There's a science here that she knows about. She studied for her entire life, and it was a perfect fit for this case. And for that reason, we believe that a new finder of fact should hear this case. Mr. Johnson, let's assume that you're right about everything that you've said. Isn't the medical evidence enough to convict him? I don't believe so, because the defense had an expert. I think, too, one would think, well, this is a terrible injury. But one must remember that a medical expert testified, Dr. Lockhart, no, this can happen. And this leads into another thing that happened at the post-trial level. There was an allegation of ineffective, a different type of allegation of that the court should have found counsel ineffective for not supplying Dr. Lockhart with the articles his client gave so that Dr. Lockhart's opinion could be supported by the literature. That was not done. And also the victim's records, including records from the Mayo Clinic, to show that she was predisposed to this type of injury, should have been presented, and that was not done. And, in fact, the court did say that may have passed the first level of Strickland. It might have been ineffective not to do that. But, again, the court found no prejudice. I'm saying if you throw all these things into the mix now to a new finder of fact, there is certainly a reasonable probability that a new outcome would be found. And we are not arguing, of course, an insufficiency of evidence here. It's different than that. But, again, while the medical evidence, it seems illogical to think this type of injury could occur through consensual sex or rough sex, the fact is expert testimony on both sides was presented. Two minutes. So they were married 12 years? They were married for a long time, and it's pretty undisputed that this was heading for divorce. They were not getting along. And, again, that would be a new finder of fact would be very reasonable to think that when this happened, she did not like him, and this was used. And I'm not saying this is speculation, but a reasonable finder of fact may certainly could reasonably infer that that form related her memories. She didn't like him. And so when she's trying to fill in the gaps, as Dr. Frommie said, Dr. Frommie said, hey, when you can't remember a thing, it doesn't make sense. Even when someone suggests something to you about what happened, you don't remember it. What human nature does is we fill in the gaps. These people fill in the gaps. And so those gaps are filled by a woman who basically hates this man. Did he interview the victim? Did Dr. Frommie? No. She reviewed the testimony and that type of thing. And I will say that I asked Dr. Hartman because he suggested that the victim had to be interviewed. And so I said, well, did you interview the victim? And he said no. And then he basically said, and that wouldn't have done any good anyway. So I don't know what that testimony meant. The fact is she based it on what she saw. A current interview now does not seem to, what seems relevant is what was happening at that time. And I can't empathize enough at closing that, again, this fact finder heard that her blood alcohol level was 0.11. It was likely in the neighborhood of 0.193 to 0.23. And that is whether or not that's bombed out of her mind is one thing. But the fact is it's a blackout. And those memories don't come back. And for that reason, we're asking to present this case to a new finder of fact that can hear these facts that were not presented previously. Thank you. Mr. Johnson, I have a couple. I didn't get to finish my question. Oh, I'm sorry. They've been married 12 years. They have four children. And it's your client's contention that consensual sex caused life-threatening injuries? It is my client's position that this was consensual sex. And then I believe there's an issue as to whether it's life-threatening injuries or not. That was the medical testimony? I thought, just reviewing it, I thought at the post-trial hearing the judge suggested that it may not have been life-threatening after all. But either way, I cannot tell you if that is exactly my client's defense. My client's defense is that this was consensual sex between me and my wife. And, unfortunately, this occurred. And Dr. Locker said, and this can occur. And that's a fact question for the jury. Well, it's the bench trial. Yes, based on – well, I think it's one that experts have to determine. Life-threatening? Yes. Well, and I think life – I mean, I think they have to look at, more importantly, the medical expert testimony and decide can it happen through consensual sex. And there was testimony on both sides there. Great. All right. Thank you. May it please the Court? Just initially, I argued res judicata and forfeiture in my brief because this Court decided on direct appeal that the defense attorney was not ineffective. And now the defendant is trying to take another bite out of the apple and raise ineffective assistance of counsel again. But under two different theories. I have to point out that the people did not argue this below, so it's technically forfeited. But as we know, forfeiture and res judicata are a limitation inside the parties and not on this Court. So this Court could find res judicata or forfeiture if it would like to do so. With that, I'd like to just address Justice Dade's question. It's true that this couple was married for 12 years. And I guess after doing criminal law this long, it never ceases to amaze me how one person can be so cruel to another. You may be even a wife here. And Dr. Citrini Best, the surgeon who repaired the victim's injuries here, said these were life-threatening injuries. These could not have occurred through consensual sex. Actually, she said that the victim would have bled to death if this surgery had not been performed in a timely manner. Now with Dr. Frommi's testimony, it's kind of interesting. She says that you cannot look at a person and see that they're in an alcoholic blackout. Yet Dr. Frommi looks at the alcohol report, she looks at the transcript and the police reports, and somehow she comes up and finds that magically the victim must have been in an alcoholic blackout. If you can't see somebody and say that they're in an alcoholic blackout, how can you render an opinion just by these transcripts and these other facts? And it's true, Dr., it's true that if this woman was in an alcoholic blackout, the defendant could not, she could not give consent, and this would still be aggravated criminal sexual assault. But the issue here is the narrow issue of whether the trial judge's finding was against the manifest way to the evidence that the defense proved that there was a reasonable probability, but for counsels not calling these experts, the outcome of the trial would have been different. And the trial judge concluded that not only there was no reasonable probability, but there was no probability. The trial judge discounted Dr. Frommi's testimony because he said that the victim was able to recall facts after this incident. Namely, the consent, the issue in this case is whether the victim consented to sex. It's kind of immaterial how she got around from the backyard to the bathroom to the upstairs bedroom. The victim testified adamantly that the defendant wanted sex, and she told him no, and then he tried to take her pants and underwear off, and she was not able to stop him, and he overpowered her. She was screaming stop, stop, and kicking the defendant here. So there's no doubt that the victim's testimony that there was not consent here, and this was rebutted by the ER nurse and the ER doctor. The victim had told them those two the same story that he wanted sex and she did not consent and was fighting against the defendant. With regard to Dr. Lanky's testimony regarding the blood alcohol level, the trial judge accepted Dr. Lank's testimony as true, and yet he found that the victim was highly intoxicated, but found that she was credible and the defendant was not credible. One of the reasons, or two of the reasons, is because the defendant had told the first police officer at the scene, we came back from the Morris Festival and bam, she started bleeding right away. There's no mention of sex or any other thing that could have caused the bleeding. Another indication that was conflicting with the defendant's testimony or shed light on his guilt was one police officer was driving by trying to find the residents because neighbors had called the police because they had heard the victim scream. The officer said that he drove by the house and the porch light was on, he turned around and came back and he saw that the porch light was turned off. There's another inference of guilt. So even if you considered the testimony of Dr. Franny and Dr. Lank, the trial judge found that his decision would not have been different. Considering all of this evidence, he cannot say that the trial judge's determination here was against the manifest way to the evidence. I'd ask that you affirm the trial judge's order dismissing the defendant's post-conviction petition. Is that it Mr. Leonard? That's it. Okay, all right. Mr. Johnson's in rebuttal. And by the way, when is finding manifestly erroneous? When it is clearly evident the opposite conclusion. When the opposite conclusion is clearly evident. And counsel has stated that, again, I can't emphasize enough. Yes, Dr. Franny is testifying to a science. We all can look at someone and see if they're really, really drunk. But that does not mean we know if they are, as she testified, that they're in a blackout or not. If, indeed, counsel is stating that she can't do this under any circumstances, that really sounds to me like they needed to attack her qualifications and we should have had a fry test or something like that. But we didn't. They never did that prior to the evidentiary hearing. And the fact is, as she said, long-term memory, all we're talking about is memory here. And the point is, absolutely, that just because Ms. Pellegrini was very drunk doesn't mean that she couldn't consent. And doesn't mean that Mr. Pellegrini would have had any idea. Now, I will grant you that this is very unique. What we have here is an injury. I do believe, as counsel is exactly right, that it was deemed life-threatening at the trial. But I do believe that after the trial, the judge shifted a little bit. And while I'm talking about the judge, counsel just stated correctly, the judge said Dr. Fromme wouldn't have changed his decision. But that's not what we're talking about here. That's correct. But I think it's relevant to see if he says, it's not going to change my opinion. I mean, it's very clear. This trial judge, and he believed what he believed. But we didn't have to change. Our burden was not to change his opinion. Our burden was to show that there was reasonable probability that a new finder of fact would change their mind. And let's just recap briefly, and then I'll stop. Basically, that a blackout means that short-term memory is never converted to long-term memory. Which means what? Which means that. They don't have a short-term memory? They don't have a long-term memory? It means that whatever happens, let's say, during that alleged assault or that consensual act, certainly our position obviously, this victim is never going to remember because she's in a blackout. Not even minutes later? Not even minutes later. And again, that's where the divorce and the rocky road comes in. There's no dispute. This was rocky. And again, we are not saying Ms. Pellegrini lied. We're saying that she doesn't remember. And Dr. Fromme said, so what happens is you fill in gaps. But there is no such thing as fight or flight. Ms. Pellegrini, because one of the issues was, well, you don't remember so much about coming home, what you were doing in the backyard, what you were doing locked in the bathroom, what you did when you passed out there, how you got to the bedroom. You don't remember any of that. How do you remember this? Well, let me ask you this. You know, of course, it seems trouble of common sense. It's not very common, especially in courthouses. Somebody's walking around the house. What do you do all day? Well, I don't remember. What time did you go to the basement? What time did you have lunch? What time did you do this? Exactly what time? Then somebody comes in the front door and stabs him. And I remember that. And I remember all the events that surrounded that because that was a startling event. It didn't seem pretty normal. And when you take all of it, even if this expert here were justified, when you look at all the facts in this case, the other facts, including what the victim told the paramedics and what the police officer heard for that ER nurse immediately after this happened, and plus all the other facts, your client's behavior, for example, he says to you he's gushing blood. He doesn't call for the ambulance or doesn't call for any help. You put all that stuff together. He gives several different stories to the police. Do you really think is there a reasonable probability that this testimony is going to change a fact finder's mind? Absolutely. First of all, I don't think we can get into somebody's head. I don't think after this kind of – Wasn't that exactly what your expert's trying to do? Again, a couple things there. Common sense, you've taken alcohol out of the equation. If alcohol is out of the equation, I agree with everything you said about you don't remember what you did, but you do remember getting stabbed. And that's what a jury would think, even if alcohol is involved, if they don't have an alcohol expert to testify. Surprisingly and counterintuitively, it doesn't matter the specific nature of the event that happens. If you're in a blackout, you don't remember it. And, Your Honor, they had a chance to bring in an expert of their own to say hogwash. Well, if we accept that basically your expert is correct, and your expert's testimony is based solely on ETLH levels, right? No. As far as the opinion about this woman. Oh, no, no, no. One of the blood alcohol level, because if she got a blood alcohol level of .11, like the state argued at trial, she very well – Mel said, you know, the chances are – I don't know that's going to do it. That's not blackout consistent. But she got the blood alcohol level of .193 to .23. And she's basing it on this woman also saying, at one point, this woman says, I blacked out. She actually says I blacked out at one stage. And she's basing it on all the other evidence. And I do want – If it were your expert, that wouldn't be credible testimony. Whether – okay. Well, no. No. The expert said you can't determine by looking at someone whether or not they're in a blackout or not. But I don't know that she would say one can completely discount someone saying I was blacked out. Now, this is only for one specific instance. That doesn't carry the day for us. We aren't in here saying, hey, look, she said she was blacked out. So you've got to believe that. Are there two different definitions of blackout, though? There are grayouts and blackouts. No. I mean, somebody can say I blacked out, and they mean I passed out temporarily. Correct. Yes, we'd have to know exactly what she meant by blackout. Very different than an expert saying here's what happens in a blackout and here's what it was. And also, you know, talking about what Ms. Pellegrini said to the first responders, she also at one was asked what happened. She said I don't know. Another time she said he was too big and he got stuck. So she did not give a consistent story about what happened. As to the porch light, if we're resorting to porch lights on and off, I think that shows the closeness of the evidence. And, again, while we do listen to the trial judge's, you're reviewing the finding, not the reasoning, it does mean something, I believe, that the judge made a short opinion after the bench trial saying, I believe her, I don't believe him, and did not say there's just no possible way this injury would have occurred absent nonconsensual sex. Because I think the judge probably canceled out the experts. Again, there were experts on both sides. So I think there's a lot here. The victim's record showing she was predisposed to this type of injury. The literature that supported the doctor's opinion that he rendered at the trial and Dr. Fromme's opinion and the appropriate blood alcohol level. Should a finder of fact hear these things, it would give Mr. Pellegrini a fair day in court. And for that reason, we ask that you remand for a new trial. Thank you. Let me ask you one more thing, because I thought you made a comment in your original argument that, well, they defined these people's head for their voice, they don't like each other. A double-edged sword, isn't it? Because if she didn't like him and he didn't like her, then he was overly rough with her because he didn't like her, too. Well, I think that there had – I don't really think it's a double-edged sword in this case, no, because I think the fact is when you have an expert like Dr. Fromme to say what happens is people fill in the gaps of their memory when they're in a blackout, the far more likely inference the jury is going to draw is that she hates this guy and so she's saying this about him. All right. Well, thank you both for your arguments here this morning. This matter will be taken under advisement. This case will be issued as I indicated originally. Judge Leckie will be participating in the resolution of this matter. Right now, there will be a brief recess for a panel change for that case.